1   PETER C. WETHERALL, ESQ.
    Nevada Bar No. 4414
2   **WETHERALL GROUP, LTD.**
    9345 W. Sunset Road, Suite 100
3   Las Vegas, NV 89148
    Telephone: (702) 838-8500
4   Facsimile: (702) 837-5081
    Email: pwetherall@wetherallgroup.com
5
    Aaron Brody, Esq. (Pro Hac Pending)
6   Michael J. Klein, Esq. (Pro Hac Pending)
    STULL, STULL, & BRODY
7   6 East 45th Street
    New York, NY 10017
8   Telephone: (212) 687-7230
    Facsimile: (212) 490-2022
9   Email: abrody@ssbny.com
              mklein@ssbny.com
10
    Attorneys for Plaintiffs
11

12                 UNITED STATES DISTRICT COURT

13                     DISTRICT OF NEVADA

14

15   MORRIS AKERMAN, Individually and          Case No.:
     On Behalf of All Others Similarly Situated,
16                                              CLASS ACTION
                              Plaintiff,
17                                              **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**
                v.
18                                              JURY TRIAL DEMANDED
     INUVO, INC., RICHARD HOWE, G.
19   KENT BURNETT, PAUL L. FOSTER,
     GORDON   CAMERON,   CHARLES
20   MORGAN, and PATRICK TERRELL,

21                           Defendants.

22        Plaintiff Morris Akerman ("Plaintiff") by and through his undersigned attorneys, brings

23   this class action on behalf of himself and all others similarly situated, and alleges the following

24   based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other

25   matters, upon the investigation of counsel, which includes, without limitation: (a) review and

26   analysis of public filings made by Inuvo, Inc. ("Inuvo" or the "Company") and other related

27   parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b)

28   review and analysis of press releases and other publications disseminated by Inuvo and other

                                          1

related non-parties; (c) review of news articles, shareholder communications, and postings on Inuvo's website concerning the Company's public statements; and (d) review of other publicly available information concerning Inuvo and Defendants.

### NATURE OF THE ACTION

1.    This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Inuvo against the Company and the members of the Company's board of directors (the "Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of Inuvo.

2.    On November 2, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") by and among, ConversionPoint Technologies Inc. ("ConversionPoint"), ConversionPoint Holdings, Inc. ("New Parent"), Inuvo, CPT Merger Sub, Inc. ("ConversionPoint Merger Sub"), and CPT Cigar Merger Sub, Inc. ("Inuvo Merger Sub"). The transactions referred to in the Merger Agreement are referred to herein as the "Proposed Merger" or the "Mergers".

3.    Upon completion of the merger between Inuvo and a subsidiary of New Parent, each share of Inuvo common stock will be converted into the right to receive $0.45 in cash and 0.18877 shares of New Parent common stock, which the Merger Agreement calls the "Inuvo exchange ratio", and which is sometimes referred to herein as the "Merger Consideration."

4.    The consummation of the Proposed Merger is subject to certain closing conditions, including the approval of the stockholders of Inuvo. The Company expects the Proposed Merger to close in the first quarter of 2019.

5.    On December 17, 2018, in order to convince Inuvo shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a joint materially incomplete and misleading registration statement, which was filed by New Parent on Form S-4 with the SEC (the "S-4" or the "Registration Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

6.      While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the S-4, they have failed to disclose certain material information that necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the S-4 incomplete and misleading.

7.      It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.

8.      Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Inuvo stockholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue had an effect in this District; (ii) Inuvo is incorporated within this District; (iii) each of the Individual Defendants, and Company officers and/or directors, is subject to personal jurisdiction

in this District; and (iv) Defendants have received substantial compensation by doing business in this District and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12.     Plaintiff is, and has been at all relevant times, the owner of Inuvo common stock and held such stock since prior to the wrongs complained of herein.

13.     Defendant Inuvo, Inc. is a Nevada corporation with its principal executive offices located at 500 President Clinton Ave., Suite. 300, Little Rock AR 72201. Inuvo's common stock is listed on the NYSE American under the ticker symbol "INUV."

14.     Defendant Richard Howe ("Howe") is, and has been, Chairman of the Board and Chief Executive Officer of the Company at all times relevant hereto. Howe will also be appointed by Inuvo to be a director of New Parent if the Proposed Merger is finalized.

15.     Defendant G. Kent Burnett ("Burnett") is, and has been, a director of the Company at all times during the relevant time period.

16.     Defendant Paul L. Foster ("Foster") is, and has been, a director of the Company at all times during the relevant time period.

17.     Defendant Gordon Cameron ("Cameron") is, and has been, a director of the Company at all times during the relevant time period. Cameron will also be appointed by Inuvo to be a director of New Parent if the Proposed Merger is finalized.

18.     Defendant Charles Morgan ("Morgan") is, and has been, a director of the Company at all times during the relevant time period.

19.     Defendant Patrick Terrell ("Terrell") is, and has been, a director of the Company at all times during the relevant time period.

20.     Defendants Howe, Burnett, Foster, Cameron, Morgan, and Terrell are collectively referred to herein as the "Individual Defendants" and, with Inuvo, as "Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the other stockholders of Inuvo (the "Class"). Excluded from the Class are Defendants herein and any person or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of May 2, 2018, there were approximately 28,618,580 shares of Inuvo common stock outstanding, beneficially held by hundreds, if not thousands, of individuals and entities scattered throughout the country. The actual number of public stockholders of Inuvo will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the S-4 in violation of Section 14(a) of the Exchange Act ("Section 14(a)");

ii.     whether the Individual Defendants have violated Section 20(a) of the Exchange Act ("Section 20(a)"); and

iii.     whether Plaintiff and the other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading S-4.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

### SUBSTANTIVE ALLEGATIONS

**Background of the Company**

23.     Inuvo is a technology company that provides data-driven platforms that can automatically identify and message online audiences for any product or service across devices, channels and formats, including video, mobile, connected TV, display, social and native. There are many barriers to entry to Inuvo's business that would require proficiency in large scale data center management, software development, data products, analytics, artificial intelligence, integration to the internet of things, or IOT, the relationships required to execute within the IOT and the ability to process tens of billions of transactions daily. Inuvo's intellectual property is protected by 15 issued and 8 pending patents. The Company was incorporated under the laws of the State of Nevada in October 1987.

**Background of the Proposed Merger**

24.     According to the S-4, from time to time, reviews of strategic options have led representatives of Inuvo and ConversionPoint to consider and discuss potential strategic alternatives.

25.     For several years the Board has reviewed, from time to time, Inuvo's strategic alternatives and prospects, mostly during Board meetings.

26.     On November 13, 2015, Inuvo engaged Canaccord Genuity LLC ("Canaccord") as its financial advisor to advise it on the current economic environment for mergers and acquisitions and to identify and pursue potential strategic alternatives for Inuvo. From November 13, 2015 to October 24, 2016, representatives from Canaccord made contact with approximately 57 potential partners for Inuvo. Results of these discussions ranged from preliminary dismissal to participation in discussions, performance of due diligence and preliminary discussions regarding potential transaction terms. However, these discussions did not result in any offers to acquire Inuvo.

27.     Inuvo terminated its engagement with Canaccord to focus on operating its business and pursuing smaller acquisitions on November 10, 2016.

28.     On January 6, 2017, Inuvo entered into a letter of intent to acquire NetSeer, Inc. and on February 7, 2017, Inuvo closed the acquisition.

29.     In June 2017, Raghunath "Raghu" Kilambi ("Kilambi"), ConversionPoint's Vice Chair and Chief Financial Officer ("CFO") was introduced to a representative of Canaccord and organized a call between a Canaccord representative and Robert Tallack ("Tallack"), ConversionPoint's President and CEO, to discuss a potential investment banking relationship between Canaccord and ConversionPoint. Neither Kilambi nor Tallack had any further conversations with a representative of Canaccord until March 26, 2018, when Kilambi, as ConversionPoint's CFO, had a telephone conversation with a representative of Canaccord to update him on ConversionPoint's activities.

30.     On November 11, 2017, Inuvo received an unsolicited proposal to acquire Inuvo for $1.50 per share in cash from a party that Inuvo had a previous business relationship with but had not discussed strategic opportunities, which the S-4 refers to as "Party A."

31.     Inuvo entered into a non-disclosure agreement with Party A and commenced discussions regarding the possible sale of Inuvo to Party A on November 20, 2017.

32.     On November 21, 2017, the Board held a special telephonic meeting to discuss the unsolicited proposed acquisition by Party A and the status of any other potential acquisition. During the telephone meeting, the Board authorized Inuvo's management to conduct due diligence on Party A and analyze the legitimacy of Party A's offer.

33.     The Board held a special telephonic meeting on November 26, 2017 to discuss and review the potential transaction with Party A and authorized Inuvo to reengage Canaccord as its financial advisor to assist in exploring Inuvo's strategic alternatives, including a potential transaction with Party A.

34.     On December 6, 2017, Inuvo discussed the proposal to acquire Inuvo with representatives of Porter Wright Morris & Arthur LLP ("Porter Wright"), its outside legal counsel, and on December 12, 2017, Inuvo reengaged Canaccord as its financial advisor to assist

in exploring Inuvo's strategic alternatives, including the potential transaction with Party A. From December 6, 2017 to December 30, 2017, Inuvo management, with advice from its legal and financial advisors, negotiated a memorandum of understanding, which we refer to as the memorandum, with Party A.

35.     After its reengagement on December 12, 2017, except during the time of exclusivity with Party A, Canaccord began a "market test" designed to pursue strategic alternatives and identify potential acquirers of Inuvo. From December 12, 2017 to September 25, 2018, representatives from Canaccord made contact with approximately 46 potential partners for Inuvo. Results of these discussions ranged from preliminary dismissal to participation in discussions, performance of due diligence and preliminary discussions regarding potential transaction terms. However, these discussions did not result in any offers to acquire Inuvo.

36.     On December 13, 2017, the Board met telephonically to continue its discussion of the Party A acquisition and the status of any other potential acquisition activity.

37.     On December 20, 2017, Inuvo entered into a non-disclosure Agreement with an internet technology development company, which we refer to as Party B, and held preliminary discussions regarding the potential acquisition of Inuvo by Party B.

38.     On December 22, 2017, Inuvo received an incomplete draft letter of intent from Party B to acquire Inuvo. The draft letter of intent did not provide information regarding consideration for the acquisition.

39.     On December 29, 2017, representatives from Inuvo and Party B met and discussed the incomplete information in the draft letter of intent. At the meeting, Inuvo determined that Party B did not value Inuvo adequately as compared to Party A.

40.     On December 30, 2017, Inuvo's management and Canaccord discussed a negotiated memorandum with Party A at a special telephonic meeting of the Board. After substantial discussion, Inuvo's board authorized Inuvo to enter into the memorandum, and later that same day, Inuvo entered into the memorandum. The memorandum provided for the sale of Inuvo to Party A for $1.50 per share and contained certain exclusivity provisions but required a "go-shop" provision in any transaction agreement.

41.     From December 30, 3017 to May 1, 2018, Inuvo engaged in due diligence and negotiated transaction documents with Party A, with the advice of representatives from Canaccord and Porter Wright. On March 6, 2018, the parties entered into an amendment to the memorandum with Party A, which eliminated the exclusivity provisions. On May 1, 2018, Inuvo terminated the memorandum with Party A because Party A could not secure financing for the proposed transaction.

42.     On January 23, 2018, the Board met and received an update on the potential transaction with Party A from Howe, Wallace D. Ruiz ("Ruiz"), Inuvo's CFO and Secretary, John B. Pisaris ("Pisaris"), Inuvo's General Counsel, and a representative from Canaccord.

43.     On March 7, 2018, representatives of Inuvo sent a non-disclosure agreement to a China-based multimedia shopping, information and web platform, which we refer to as Party C, that Ruiz had been introduced to in November 2017.

44.     Canaccord, on behalf of Inuvo, reached out to Party B on March 22, 2018 to determine if Party B had any continuing interest in pursuing a transaction with Inuvo, but did not receive a formal response until May 31, 2018.

45.     On April 2, 2018, Inuvo and Party C entered into a non-disclosure agreement.

46.     On April 5, 2018, Kilambi, Tallack and Andre Peschong ("Peschong"), ConversionPoint's Chief Strategy Officer and director, met with a representative of Canaccord at Canaccord's offices in New York to discuss financing and strategic opportunities for ConversionPoint. During that meeting, a representative of Canaccord suggested that ConversionPoint consider Inuvo, a client of Canaccord, as a potential strategic acquisition candidate.

47.     At a Board meeting held on April 17, 2018, Howe, Ruiz and Pisaris provided the Board with an update on the potential transaction with Party A and the status of the market test to find other potential strategic partners.

48.     On April 15 and April 18, 2018, a representative of Inuvo met with Party C in China to discuss the possibility of Party C investing approximately $54.6 million in Inuvo in exchange for a controlling interest. Pursuant to these discussions, Inuvo drafted a term sheet for

the proposed transaction and presented it to Party C on April 19, 2018. On April 23, 2018 a representative of Inuvo met with Party C to discuss the term sheet.

49.     After reviewing Inuvo's SEC filings and discussing its business with ConversionPoint's management, on April 24, 2018, Kilambi had a further telephone conversation with a representative of Canaccord and requested an introduction with Inuvo.

50.     On April 27, 2018, a representative of Canaccord sent an email introducing Kilambi and Howe.

51.     On May 10, 2018, Kilambi, Peschong and Howe had an initial telephone conversation in which they discussed the businesses of ConversionPoint and Inuvo and determined that it would be worthwhile to execute a mutual non-disclosure agreement and engage in further discussions regarding a potential transaction. On May 17, 2018, Howe sent a proposed form of mutual non-disclosure agreement to Kilambi, which was executed on that day.

52.     On May 19, 2018, Party C agreed in principle to sign the term sheet; however, Party C subsequently indicated that it would not move forward with evaluating the potential transaction due to the status of trade relations between the United States and China.

53.     On May 24, 2018, Howe and Don Walker "Trey" Barrett III ("Barrett"), Inuvo's Chief Operating Officer, met with Tallack, Kilambi, Peschong, Haig Newton ("Newton"), ConversionPoint's Chief Technology Officer and director, and Jonathan Gregg ("Gregg") who has served as President of Sellpoints (which ConversionPoint acquired) since March 2018, at ConversionPoint's prior corporate headquarters, in Irvine, California, at which they presented overviews of their respective businesses and discussed the potential synergies between ConversionPoint and Inuvo. Between May 24, 2018 and June 23, 2018, ConversionPoint and Inuvo had various telephone calls, and exchanged various documents, including, investor presentations, capitalization information and financial information.

54.     Representatives from Inuvo attended an investor presentation by Party B on May 31, 2018 and exchanged investor relations presentations and informally discussed the opportunity for Party B to reengage in discussions regarding the possible acquisition of Inuvo. At the meeting, Party B indicated that it operated an approximately $100 million run rate internet advertising

business in a wholly-owned internet advertising subsidiary, which we refer to as Party B's operating subsidiary, and wanted to explore a merger whereby Inuvo would merge with Party B's operating subsidiary and remain a public company controlled by Party B.

55.    On June 14, 2018, Howe corresponded with Party B regarding the potential merger of Inuvo with Party B's operating subsidiary.

56.    On June 24, 2018, Howe met with Kilambi and Peschong at ConversionPoint's offices in Emeryville, California, to further discuss potential synergies between the businesses.

57.    On June 29, 2018, Inuvo provided ConversionPoint with further information regarding Inuvo's capitalization structure.

58.    On July 1, 2018, Inuvo delivered a term sheet to Party B regarding the potential transaction discussed in Howe's June 14, 2018 correspondence, without valuation information.

59.    On July 2, 2018, a representative from Party B met with Howe, Ruiz, Pisaris and Barrett at Inuvo's office to discuss the potential merger.

60.    On July 16, 2018, Ruiz participated in a call with Party B to discuss a potential transaction. Party B indicated its proposed percentage ownership for Inuvo stockholders after the merger would be based on relative adjusted EBITDA contributions from Inuvo and Party B, with approximately 28% of the resulting entity allocated to Inuvo.

61.    At a ConversionPoint board meeting held on July 17, 2018, Kilambi discussed Inuvo's business, the potential synergies between ConversionPoint and Inuvo, and a potential acquisition of Inuvo. The ConversionPoint board was presented with and discussed an initial draft letter of intent prepared by representatives of Troutman Sanders LLP ("Troutman Sanders"), outside legal counsel to ConversionPoint. The draft letter of intent provided for an all-stock merger transaction between Inuvo and ConversionPoint to be effected through a share exchange that would result in former ConversionPoint stockholders and Inuvo stockholders owning approximately 65% and 35%, respectively, of the issued and outstanding shares of the combined company's common stock. The letter of intent also provided for customary "no-shop" restrictions and a $20 million financing contingency. After a lengthy discussion, the ConversionPoint board

unanimously authorized ConversionPoint's officers to finalize the negotiation of, and to enter into, a letter of intent with Inuvo.

62.    On July 17, 2018, at a Board meeting, Howe updated the Board on discussions with potential strategic partners, including Party B and ConversionPoint. The discussion regarding ConversionPoint included a preliminary review of ConversionPoint's business and potential synergies. The discussion regarding other potential strategic partners included a status update on discussions with other potential strategic partners that had not developed beyond preliminary stages.

63.    On July 20, 2018, Ruiz corresponded with Party B and suggested that a more appropriate percentage ownership for Inuvo stockholders after the merger with Party B's operating subsidiary would be based on relative revenue contributions. Active discussions with Party B discontinued on July 20, 2018 after the parties reached an impasse on valuation.

64.    On July 23, 2018, Kilambi sent Howe and other members of Inuvo's senior management team the executed letter of intent containing the terms discussed at the July 17, 2018 ConversionPoint board meeting, which Inuvo did not execute.

65.    Howe, Ruiz and Pisaris and a representative of Canaccord participated in a teleconference on July 24, 2018, to review and discuss the letter of intent from ConversionPoint and Inuvo's strategic alternatives. Matters discussed regarding the ConversionPoint letter of intent included the transaction structure, transaction price and contingencies. Matters discussed regarding other strategic alternatives included an update on discussions with potential strategic partners. At this meeting, it was concluded that the potential transaction with ConversionPoint had a low probability of moving forward because of the complex transaction structure and contingencies but that representatives from Inuvo would request preliminary information from ConversionPoint regarding its business, financial statements and projections. At this meeting, it was also determined that Inuvo's focus would be to continue to pursue its discussions with other potential strategic partners.

66.    On August 1, 2018, Howe sent Kilambi an email indicating that an all-stock transaction would not be approved by the Inuvo stockholders and indicated that he would contact Kilambi in mid-August 2018.

67.    Commencing on August 9, 2018, after Howe notified ConversionPoint that Inuvo was not interested in an all-stock transaction, ConversionPoint commenced discussions with another United States public company regarding a potential merger. Kilambi and various other members of ConversionPoint's management team had various telephone calls and exchanged various documents and due diligence items. On August 22, 2018, Kilambi, Stephen Blazick ("Blazick"), ConversionPoint's Corporate Secretary, and Newton attended an in-person meeting with management of this company.

68.    On August 24, 2018, ConversionPoint submitted a non-binding letter of intent to this public company for an all-stock merger transaction. There were several conversations between ConversionPoint's management and this public company's management between August 24, 2018, and August 31, 2018, regarding the terms of the non-binding offer. Discussions ceased on August 31, 2018, and on September 11, 2018, Kilambi sent an email to the CEO of such company advising him that ConversionPoint was commencing discussions with another undisclosed company (Inuvo).

69.    On August 16, 2018, during a telephone conversation, Howe and Kilambi discussed the potential transaction, including transaction structure, financing and possible inclusion of a cash component.

70.    On August 24, 2018, Howe sent an email to Kilambi and Peschong discussing, among other things, potential obstacles to a transaction, including transaction structure, valuation and consideration mix for Inuvo stockholders.

71.    On September 11, 2018, Howe and Kilambi had a telephone conversation to discuss Inuvo's continued interest in engaging in a transaction, provided that the merger consideration to be received by Inuvo's stockholders included a significant cash component. During this call, Kilambi indicated that he would discuss the same with ConversionPoint's management.

72.     On September 13, 2018, Kilambi, Blazick, and Tom Furukawa ("Furukawa"), ConversionPoint's Chief Product Officer, met with Howe and Barrett and other members of Inuvo's management at Inuvo's offices in Little Rock, Arkansas to further discuss Inuvo's business units and potential strategic synergies between the companies.

73.     On September 18, 2018, Howe sent an email to Kilambi indicating that he believed there were significant synergies between the companies' businesses and invited ConversionPoint to make a new offer that included a cash component.

74.     On September 18, 2018, Pisaris discussed the revised transaction structure with representatives of Porter Wright.

75.     On September 19, 2018, Pisaris and representatives of Porter Wright and Troutman Sanders had a conference call to further discuss a revised transaction structure.

76.     After informal discussions with Tallack and the other members of the ConversionPoint board, on September 20, 2018, Kilambi sent Howe a new unsigned draft letter of intent, which included $20,431,390 ($0.60 per Inuvo share) in cash consideration, and adjusted conversion ratios, such that upon consummation of the transaction, the former ConversionPoint stockholders and Inuvo stockholders would own approximately 73.35% and 26.65%, respectively, of the combined entity. The new draft letter of intent also increased the financing contingency from $20 million to $40 million.

77.     Between September 20, 2018 and September 25, 2018, various telephone and email discussions ensued between ConversionPoint's management and representatives of Troutman Sanders and Inuvo's management and representatives of Porter Wright and Canaccord, which resulted in minor modifications to the letter of intent. Inuvo's management sent ConversionPoint a revised letter of intent on September 24, 2018 with minor changes, including Inuvo's required consent to the terms of a proposed financing contingency, elimination of a closing condition that ConversionPoint have no more than 2% of its stockholders exercise appraisal rights and other minor changes.

78.     On September 25, 2018, members of ConversionPoint's senior management and representatives of Troutman Sanders participated in various email and telephone conference

discussions and proposed minor changes to the letter of intent. Later that day, Kilambi sent a signed revised letter of intent to Howe, which included revised exchange ratios that would result in former ConversionPoint stockholders and Inuvo stockholders owning approximately 73.33% and 26.67%, respectively, of the combined entity. Kilambi also indicated that the revised letter of intent would expire that Friday, September 28, 2018, and that once the revised letter of intent was signed he would meet with various investment bankers and investors in Toronto to discuss their willingness to raise capital and meet the financing condition. The letter of intent was executed by ConversionPoint on September 25, 2018 and delivered to Howe.

79.     On September 25, 2018, Howe distributed the final version of the letter of intent to the Board. On September 26, 2018, each member of the Board corresponded with Howe regarding the letter of intent and authorized Howe to execute the letter of intent. Later that day, on September 26, 2018, Howe executed the final version of the letter of intent and delivered it to ConversionPoint.

80.     During the week of October 1, 2018, Kilambi met with various investment bankers and investors in Toronto including GMP Securities, LP ("GMP"), Beacon Securities and Canaccord to discuss serving as financial advisors for the financing required pursuant to the letter of intent.

81.     On October 5, 2018, ConversionPoint was granted access to a data room populated with some due diligence documentation with respect to Inuvo. Starting on October 5, 2018 through the signing of the merger agreement on November 2, 2018, ConversionPoint, Troutman Sanders and other advisors retained by ConversionPoint conducted a due diligence review of Inuvo, including a review of materials provided by Inuvo in the data room and by email, conducted numerous telephone conferences both internally between ConversionPoint and its various advisors and between ConversionPoint and Inuvo and its advisors to discuss ConversionPoint's findings and ask follow-up questions.

82.     On October 10, 2018, Howe, Kilambi, Tallack, Newton and Christopher Jahnke ("Jahnke"), ConversionPoint's Chief Marketing Officer and Director, met at ConversionPoint's

Minnesota office with a representative of GMP, to discuss the transaction and GMP's interest in serving as lead Canadian financial advisor.

83.     During an October 12, 2018 telephone call with Kilambi, Howe indicated that Inuvo was seeking a $1 million financing for working capital by November 1, 2018 and asked whether ConversionPoint or its stockholders had an interest in providing such financing. On October 12, 2018, Kilambi had informal discussions with Tallack, Peschong and the other members of the ConversionPoint board about providing such financing and consulted with representatives of Troutman Sanders about incorporating the same into the merger agreement.

84.     On October 14, 2018, a representative of Troutman Sanders provided an initial draft of the merger agreement to representatives of Inuvo and Porter Wright.

85.     On October 16, 2018, Inuvo was granted access to a data room populated with due diligence documentation with respect to ConversionPoint. Starting October 16, 2018 through the signing of the merger agreement, Inuvo, Porter Wright and other advisors retained by Inuvo conducted a due diligence review of ConversionPoint, including a review of materials provided by ConversionPoint in the data room and by email, conducted numerous telephone conferences both internally between Inuvo and its various advisors and between Inuvo and ConversionPoint and its advisors to discuss Inuvo's findings and ask follow-up questions.

86.     On October 18, 2018, a representative of Troutman Sanders sent an initial draft of the senior subordinated unsecured convertible notes term sheet to Inuvo.

87.     On October 19, 2018, a representative of Troutman Sanders participated in a telephone conference with a representative of Porter Wright to discuss the initial draft of the senior subordinated unsecured convertible notes term sheet. The parties discussed, among other things, the following comments to the initial draft: (i) that the amount of the termination fee be increased in lieu of a 300% redemption feature; (ii) that both parties agree to delete the antidilution adjustment by changing the overall exchange ratios; and (iii) that the revised letter of intent provided for future adjustments to ConversionPoint's capital structure. After the telephone conference, a representative of Troutman Sanders provided an email and telephone conference update to members of ConversionPoint's senior management regarding the telephone conference

with Porter Wright. Kilambi responded to the email update that the members of ConversionPoint's senior management were targeting a November 2, 2018 signing date.

88.    On October 19, 2018, a representative of Porter Wright also provided initial comments to the senior subordinated unsecured convertible note to a representative of Troutman Sanders. The revisions included, among other things: (i) the need for all funds to come from ConversionPoint in order to avoid related party transaction issues in the merger agreement; (ii) changes to the concept of maturity date to remove extension with approval of a majority of the principal note holders; (iii) changes to the Voluntary Conversion section to delete payment of accrued and unpaid interest upon conversion and to include a concept that the notes will not be convertible to Series A Preferred Stock until 90 days after the termination of the merger agreement; (iv) a requirement that Inuvo maintain a reserve of shares equal to the number of shares required for full conversion of the Series A Preferred Stock commencing from the time the Series A Preferred Stock is issued and outstanding; (v) removal of the 300% conversion feature; (vi) a requirement that amounts due could be repaid with 15 days prior written notice; (vii) elimination of provisions providing for redemption at a multiple of principal upon a change of control; and (viii) a capped conversion into no more than 19.99% of Inuvo's voting power.

89.    On October 21, 2018, Porter Wright distributed a revised draft of the merger agreement to the various interested parties. The revisions to the merger agreement included, among other things: (i) inclusion of the concept of the Inuvo bridge notes; (ii) changes to the Treatment of Inuvo Warrants section; (iii) changes to the Treatment of Inuvo RSUs section, including an addition that the Inuvo RSUs vest in accordance with the applicable Inuvo RSU vesting schedule; (iv) addition of terms relating to equity financing, including equity comfort letters in connection with a potential equity offering and an Equity Financing section; (v) changes to Agreements With Respect to Parent Post Closing section, including an additional provision to provide base salary and base wages to the employees of ConversionPoint and Inuvo who continue to be employed by New Parent; (vi) change of appraisal rights threshold from 5% to 15% of the issued and outstanding ConversionPoint Common Stock; and (vii) changes to the Termination Fee section, including the concept of a reverse termination fee.

90.     After reviewing the revisions to the agreement, on October 21, 2018, representatives of Troutman Sanders held an internal telephone conference call within the firm. They reviewed the Inuvo RSUs provided in the data room and discussed the possibility of vesting upon a change of control. Representatives of Troutman Sanders also discussed inclusion of the Equity Financing section and standard deal terms for appraisal rights thresholds.

91.     On October 22, 2018, a representative of Troutman Sanders corresponded with representatives of Porter Wright initial comments to the revised merger agreement. The comments included, among other things: (i) the preference that all Inuvo RSUs vest upon a change of control rather than only a portion and the need for potential lock-up agreements; (ii) a suggestion that the Equity Financing section is unnecessary because ConversionPoint will not receive commitment letters from financial institutions; (iii) that a significant amount of deals have an appraisal rights threshold between 5% and 10%, and given ConversionPoint's valuation, 15% is significant; and (iv) an inquiry as to whether the ConversionPoint termination fee and the reverse termination fee are different amounts.

92.     On October 22, 2018, a representative of Troutman Sanders also sent to ConversionPoint a revised Appendix A to the letter of intent, which included revisions to the ConversionPoint and Inuvo exchange ratios to account for changes in the capitalization of ConversionPoint.

93.     On October 23, 2018, a representative of Troutman Sanders sent a revised draft of the merger agreement to the various interested parties. The revisions to the merger agreement included, among other things: (i) changing the ConversionPoint exchange ratios due to changes in ConversionPoint's capitalization; (ii) changes to the Treatment of CPT RSUs section, including language that ConversionPoint RSUs will vest in accordance with the applicable vesting schedule and the deletion of per share exercise price for New Parent common stock; (iii) a note to discuss the acceleration and vesting of all Inuvo RSUs; (iv) changes to the Equity Financing section, including removal of the concept of underwriters and replacing that with the concept of intermediaries; (v) changes to the Equity Financing Covenant section; (vi) change of appraisal rights threshold from 15% to 10%; and (vii) removal of the reverse termination fee concept.

1    94.    On October 24, 2018, a representative of Troutman Sanders sent a draft of the

2    ConversionPoint and Inuvo support agreements to the various interested parties.

3    95.    Between October 24 and 25, 2018, Kilambi, Tallack and Furukawa met with

4    Howe, Pisaris, Ruiz and other members of Inuvo's management team in Little Rock, Arkansas,

5    and further discussed their respective businesses and synergies, finalized the terms for the $1

6    million note financing, and discussed certain changes to the proposed terms of the merger

7    agreement with representatives of Porter Wright and Troutman Sanders. Specifically, Inuvo

8    agreed to reduce the cash portion of the merger consideration from $20,431,390 ($0.60 per Inuvo

9    share) to $15,323,542 ($0.45 per Inuvo share), increase the percentage of the post-merger entity

10    to be owned by Inuvo's stockholders from 26.67% to 29.24%, and lower the minimum financing

11    contingency from $40 million to $36 million. The parties also agreed to include in the merger

12    agreement, a bilateral termination fee of $2.8 million in certain circumstances. The parties also

13    agreed to set the percentage of ConversionPoint shares that must not exercise appraisal rights at

14    10%.

15    96.    Counsel for ConversionPoint and Inuvo revised drafts of the merger agreement

16    and various other documents from October 25 to 30, 2018.

17    97.    Between October 29 and 31, 2018, Mr. Kilambi obtained financing comfort letters

18    from GMP, Beacon Securities, Falcon Capital and Roth Capital, which were emailed to Howe.

19    98.    On October 31, 2018, ConversionPoint loaned $25,000 to CPT Investments, LLC,[1]

20    owned by Bridgewater Capital Corporation,[2] Jeffrey Marks ("Marks"), ConversionPoint's

21    General Counsel, Senior Vice President of Corporate Development, and Kilambi. In exchange for

22    the loan, CPT Investments, LLC issued ConversionPoint a promissory note that accrues interest

23    at a rate of 10% per annum and is due and payable on or before June 30, 2019. CPT Investments,

24    LLC loaned $1 million to Inuvo in exchange for a convertible promissory note in the principal

25

26    _____

27    [1] CPT Investments, LLC, a California limited liability company, is managed by Kilambi.

28    [2] Bridgewater Capital is controlled by Peschong and Jack Thomsen ("Thomsen"), ConversionPoint's Treasurer.

amount of $1 million, which accrues interest at a rate of 10% per annum and is due and payable on or before the earlier of June 30, 2019 and the closing of the merger transaction.

99.    On October 31, 2018, a representative of Troutman Sanders distributed a revised version of the merger agreement to the various interested parties. The revisions to the merger agreement included, among other things: (i) the ConversionPoint exchange ratio and the Inuvo exchange ratio to account for the final targeted allocation of common shares of New Parent after closing; (ii) insertion of the Inuvo option exchange ratio; (iii) removal of references to equity financing in the Financing section; and (iv) a covenant that ConversionPoint will not issue, sell, pledge, dispose of or grant shares of any class of its capital stock, except that it may issue up to 500,000 shares of Common Stock at a price per share of no less than $9.21 in the ordinary course of a current securities offering.

100.    Later on October 31, 2018, a representative of Inuvo distributed a revised version of the merger agreement to the various interested parties. Also, on October 31, 2018, a representative of Troutman Sanders distributed revised versions of the securities purchase agreement and 10% senior unsecured subordinated convertible promissory note to the various interested parties.

101.    A representative of Pearlman Law Group LLP, outside legal counsel to Inuvo, distributed a revised version of the registration rights agreement to the various interested parties.

102.    Later on October 31, 2018, a representative of Troutman Sanders distributed a revised version of the registration rights agreement to the various interested parties.

103.    On that same day, ConversionPoint's board reviewed and approved the merger agreement and the $1 million bridge financing.

104.    On November 1, 2018, Howe met with Kilambi, Tallack and other members of ConversionPoint's management in Newport Beach, California. Howe, Kilambi and other members of ConversionPoint's senior management also met with representatives of Troutman Sanders to finalize the merger agreement and ancillary documents.

105.    A representative of Troutman Sanders also filed the Certificate of Incorporation for CPT Merger Sub, Inc. and New Parent and the Articles of Incorporation for CPT Cigar Merger Sub, Inc.

106.    Also on November 1, 2018, a representative of Inuvo distributed a revised version of the registration rights agreement to the various interested parties. Later that same day, a representative of Troutman Sanders reviewed Inuvo's revised changes and accepted all of them and finalized the registration rights agreement. On November 1, 2018, Kilambi, in his capacity as managing member of CPT Investments, LLC, executed the registration rights agreement.

107.    Later that day, a representative of Troutman Sanders and a representative of Porter Wright distributed final versions of the support agreements to the relevant ConversionPoint and Inuvo stockholders for signature, and the relevant parties signed the support agreements.

108.    That same day, a representative of Troutman Sanders delivered a revised draft of the merger agreement to the various interested parties. The revisions to the merger agreement included, among other things, a change to the ConversionPoint exchange ratio to reflect changes in ConversionPoint's capitalization and an adjustment divisor of 15,845,568 shares for post-merger agreement execution issuances of ConversionPoint common stock.

109.    On November 1, 2018, representatives of the Pearlman Law Group, Troutman Sanders, Porter Wright, ConversionPoint and Inuvo held a telephone conference to discuss final changes to the securities purchase agreement and 10% senior unsecured subordinated convertible promissory note. Each of the various interested parties agreed to the changes, and final versions of the securities purchase agreement and 10% senior unsecured subordinated convertible promissory note were executed.

110.    The Board held a meeting at which members of Inuvo's management, Canaccord and Porter Wright attended. Prior to the meeting, the members of Inuvo's board were furnished a final draft of the merger agreement and other information related to the proposed transaction, including the final exchange ratios, targeted allocations of New Parent common shares and per-share cash consideration. Howe and Pisaris reviewed and explained a detailed merger agreement summary prepared for the Board. At this meeting, Canaccord rendered its oral opinion to the

1    Board (which was confirmed in to be paid to the holders of Inuvo common stock writing by

2    delivery of its written opinion) to the effect that as of November 1, 2018, and based upon and

3    subject to the factors set forth therein, the Inuvo merger consideration to be paid to the holders of

4    Inuvo common stock pursuant to the merger agreement was fair from a financial point of view to

5    such stockholders. Inuvo's management discussed the proposed acquisition at significant length

6    with the Board. The Board unanimously approved and adopted the merger agreement and the

7    merger, recommended that the Inuvo stockholders adopt the merger agreement and approve the

8    merger and authorized the preparation and filing of this joint proxy statement/prospectus.

9        111.   On November 2, 2018, a representative of Troutman Sanders delivered a revised

10   draft of the merger agreement to the various interested parties. Each of New Parent,

11   ConversionPoint, Inuvo, CPT Merger Sub and CPT Cigar Merger Sub executed and delivered the

12   merger agreement, effective as of November 2, 2018.

13   **The Company Announces the Proposed Merger**

14       112.   On the morning of November 5, 2018, prior to the open of markets,

15   ConversionPoint and Inuvo publicly announced the transaction via press release, and on

16   November 7, 2018, held a joint teleconference to further discuss the acquisition. The press release

17   stated, in pertinent part:

18
19       **Inuvo Signs Definitive Agreement to be Acquired by ConversionPoint Technologies**

20
21       **Acquisition offers retailers and brands an end-to-end, AI powered, eCommerce platform with unprecedented insight into consumer behavior for stronger ROI and online sales**

22
23       LITTLE ROCK, Ark. and NEWPORT BEACH, Calif., Nov. 05, 2018 (GLOBE NEWSWIRE) -- Inuvo, Inc. (NYSE American: INUV), a provider of artificial intelligence (AI) technology for brands and agencies, today announced that it has entered into a

24   definitive agreement to be acquired by ConversionPoint Technologies, Inc., a privately held eCommerce technology company.

25
26       The acquisition will be a cash-and-stock transaction valued at approximately $2.22 per share of Inuvo common stock based on

27   34,077,624 common shares outstanding and restricted stock units that will immediately vest upon closing. Inuvo shareholders will receive $0.45 per share in cash and stock valued at an estimated

28   $1.77 per share, or approximately[  ]$75.5 million in total

consideration. ConversionPoint plans to file a Form S-4 with the Securities and Exchange Commission to register the shares of common stock to be issued in the acquisition and intends to file listing applications for the stock with the NASDAQ Capital Market and the Toronto Stock Exchange.

**Strategic Rationale for the Acquisition**

ConversionPoint is acquiring Inuvo for its patented, AI-driven consumer behavior technology, which leverages machine learning to mirror the way the human brain instantly associates ideas, emotions, places, people and objects. The combined solution is expected to offer large and small businesses a new way to compete more effectively, increase online sales, achieve higher media spend ROI and improve customer lifecycle engagement. This AI powered platform is expected to create a competitive eCommerce solution for major non-Amazon channels, such as Shopify, Big Commerce, and Walmart.com.

"Amazon controls nearly half of the $450 million in online retail sales in the U.S. thanks to their proprietary data-driven approach to consumer analysis and marketing," explained ConversionPoint CEO, Robert Tallack. "Online retailers and brands have been searching for an end-to-end data driven technology to help provide accurate information they can use to acquire customers. We believe that together our end-to-end, AI powered, eCommerce platform can offer those capabilities to the online retail channel and the direct channel that the market has been actively searching for."

ConversionPoint's current customers include major brands like Canon, Logitech and Nikon, and its technology has been integrated onto online retailer sites like walmart.com and officedepot.com. Current ConversionPoint shareholders include Menlo Ventures, Granite Ventures and IBM. The company was recently named #93 (software) on the 2018 Inc. 5000 list of the fastest-growing companies in the U.S. with audited revenues of $49.9 million in 2017.

According to the CEO of Inuvo, Rich Howe: "With our combined technologies, data sources and industry partners, we will be able to offer an even greater level of eCommerce transparency and sophistication across small, medium and large business segments. We see this combination allowing us to pursue a shared vision of providing more powerful solutions for eCommerce."

ConversionPoint enhances consumer product experiences, optimizes media spend, enables upsell, and manages fulfillment and retargeting. Inuvo has the industry's most capable technology for identifying and analyzing consumer behavioral data, along with direct access to advertising inventory from large media and technology partners.

Inuvo is a market leader in artificial intelligence whose goal it is to align one-to-one brand messaging with consumer intent. Inuvo customers include several Fortune 500 companies, major global brands and agencies. It has the world's most capable technology for

identifying and analyzing consumer behavioral data, along with direct access to advertising inventory from large media and technology partners. Inuvo harnesses the power of its patented IP by delivering high performing campaigns reaching audiences that would typically be missed.

"Inuvo's technology and product offerings makes our combination very attractive in terms of immediate cross-selling opportunities,' said ConversionPoint CFO, Raghu Kilambi. "The scale of the combined operations coupled with the identified synergies, focused on the eCommerce market, is anticipated to provide attractive upside revenue and margin expansion opportunities as well as a unique capital market story."

According to Trey Barrett, COO of Inuvo: "We have identified a number of specific near-term opportunities, including upselling Inuvo's high-margin AI powered IntentKey media to ConversionPoint's existing enterprise customers and online retail partners. We also expect to reap significant benefits from integrating ConversionPoint's retail brands into Inuvo's ValidClick platform, creating a new traffic acquisition source for ConversionPoint clients, and utilizing ValidClick's advertising inventory throughout our customer experience."

The combined company's IP portfolio is expected to include 15 issued U.S. patents and 12 patents pending.

**Additional Transaction Details**

This acquisition transaction will be effected through a newly created holding company, ConversionPoint Holdings, Inc., where Inuvo and ConversionPoint Technologies will become wholly-owned subsidiaries of ConversionPoint Holdings.

Under the terms of the definitive agreement, ConversionPoint Holdings will issue 0.18877 shares of its common stock for each one share of Inuvo common stock (or approximately 6.4 million shares in total) and will issue cash in the amount of $0.45 for each one share of Inuvo common stock (or approximately $15.3 million in total). ConversionPoint Holdings will issue 0.9840 shares of its common stock for each one share of ConversionPoint Technologies, Inc. common stock (or approximately 15.6 million shares in total).

The $1.77 estimated value per share of ConversionPoint Holdings common stock to be issued in the acquisition is based upon ConversionPoint Technologies' recent $15 million private offering that valued ConversionPoint Technologies' common stock at $9.21 per share, resulting in an estimated equity valuation for ConversionPoint Technologies of $146 million.

Following the closing of the transaction, and prior to the issuance of any stock in connection with a financing that is a condition to closing, Inuvo shareholders will own approximately 29% of ConversionPoint Holdings and will have received $0.45 per share in cash, or total cash consideration of $15.3 million.

Inuvo will operate as a wholly-owned subsidiary of ConversionPoint Holdings and is expected to maintain its offices in Little Rock, Arkansas and San Jose, California. ConversionPoint will operate as a wholly-owned subsidiary of ConversionPoint Holdings and is expected to maintain its offices in Newport Beach and Emeryville, California, and Minneapolis, Minnesota.

Robert Tallack, the current CEO of ConversionPoint Technologies, will become the CEO of the combined companies, and Richard Howe, the current chairman and CEO of Inuvo, will become chairman of the combined companies.

The closing of the transaction, which is expected to occur during the first quarter of 2019, is subject to customary and other closing conditions, including a requirement that ConversionPoint raises a minimum of $36 million of gross proceeds from the issuance of equity and/or debt, a portion of which will be used to fund the cash portion of the acquisition transaction, as well as the approval of the stockholders of ConversionPoint Technologies and Inuvo. All of Inuvo's directors and executive officers, as well as ConversionPoint Technologies stockholders owning 70% of ConversionPoint Technologies' outstanding shares have signed support agreements in favor of the acquisition.

Upon the closing of the acquisition, ConversionPoint Holdings expects to change its name to ConversionPoint Technologies.

For ConversionPoint Technologies, Troutman Sanders LLP served as legal advisors. ConversionPoint's financial advisors on the required debt and/or equity financing are expected to include GMP Securities L.P., Beacon Securities Ltd. and Falcon Capital.

For Inuvo, Porter Wright Morris & Arthur LLP and the Pearlman Law Group served as legal advisors. Canaccord Genuity acted as financial advisor to Inuvo.

Additional details about this transaction will be available in a Form 8-K to be filed by Inuvo with the Securities and Exchange Commission and accessible in the investor relations section of Inuvo's website at www.investor.inuvo.com.

Information regarding ConversionPoint Technologies, including audited historical financial information, may be found on its website at www.conversionpoint.com.

### **THE PRECLUSIVE DEAL PROVISIONS**

113.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Inuvo.

114.    Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish ConversionPoint with the terms of any competing bid and confidentiality agreement; (iii) a matching rights provision which gives ConversionPoint five business days to match any unsolicited superior acquisition proposal the Board receives; and (iv) a provision that requires the Company to pay ConversionPoint a termination fee of $2,800,000 if the Company, among other things, signs an alternative acquisition agreement.

115.    The termination fee, which is over 7.3% of Inuvo's $38,274,000 post-announcement market capitalization as of the close of markets on December 19, 2018, standing alone, precludes any topping bidder from coming forward. *See, e.g.*, *Phelps Dodge Corp. v. McAllister*, Civil Action No. 17398, 17383, 17427, 1999 Del. Ch. LEXIS 202, at *5 (Ch. Sep. 27, 1999) (recognizing that a termination fee of "6.3 percent certainly seems to stretch the definition of range of reasonableness and probably stretches the definition beyond its breaking point.")

116.    These deal protection provisions, particularly when considered collectively, substantially and improperly limited the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Inuvo.

117.    Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Inuvo's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

**Interests of the Officers and Directors of Inuvo to Completing the Proposed Merger**

**118.**    Certain of the officers and/or directors of the Company have significant financial interests in completing the Proposed Merger. The following, taken from the S-4, shows the potential payouts to Inuvo's officers and directors as a result of their exchange of shares of Inuvo for the Merger Consideration:

| Name | Number of Restricted Stock Units (#) | Value of Restricted Shares ($) |
|---|---|---|
| Charles D. Morgan | 38,961 | $ 49,480.47 |
| Patrick Terrell | 38,961 | $ 49,480.47 |
| Gordon J. Cameron | 38,961 | $ 49,480.47 |
| G. Kent Burnett | 38,961 | $ 49,480.47 |
| **Total for all non-employee Directors** | 155,844 | $ 197,921.88 |

119.   The S-4 also lists the "Golden Parachute Compensation" that Inuvo's named executive officers stand to receive as a result of the Proposed Merger:

| Named Executive Officers | Cash ($) | Equity (1) ($) | Total ($) |
|---|---|---|---|
| Richard K. Howe | $ 718,057) (2 | $ 533,400 | $ 1,251,457 |
| Wallace D. Ruiz | $ 417,206) (3 | $ 190,500 | $ 607,706 |
| Don (Trey) Barrett III | - | $ 254,000 | $ 254,000 |

120.   The S-4 further disclosed that:

As a condition to the closing of the mergers, New Parent and Inuvo will enter into contingent separation and release agreements, sometimes referred to herein as separation agreements, with each of Richard K. Howe, Wallace D. Ruiz, and John B. Pisaris, concurrently with the closing of the mergers. Each of Messrs. Howe, Ruiz, and Pisaris may terminate his employment with Inuvo and be owed severance pay (as described below) upon the earlier of (i) 180 days after the closing of the mergers, or (ii) upon thirty days written notice from the executive, which notice shall not be given prior to the sixty day anniversary of the closing of the mergers. Prior to terminating employment, (i) each of Messrs. Howe, Ruiz, and Pisaris shall assist with the orderly transition of duties after the closing of the mergers, (ii) Inuvo shall continue to pay each of Messrs. Howe, Ruiz, and Pisaris his base salary and (iii) Messrs. Howe, Ruiz, and Pisaris will continue to be eligible to participate in Inuvo's health care and dental insurance coverage under Inuvo's benefit plans.

> Upon termination of Mr. Howe's employment, Mr. Howe will be entitled to a lump sum payment of $550,000. Further, after six months from Mr. Howe's termination date has elapsed, Mr. Howe will be entitled to the installment payment of $168,067, paid over a period of six months in twelve equal installments payable on the 15th day and last business day of each month.
>
> Upon termination of Mr. Ruiz's employment, Mr. Ruiz will be entitled to a lump sum payment of $417,206.
>
> Upon termination of Mr. Pisaris's employment, Mr. Pisaris will be entitled to a lump sum payment of $398,097.

**Interests of the Financial Advisors to the Proposed Merger**

121.    Pursuant to a letter agreement, dated as of December 12, 2017, Inuvo engaged Canaccord to act as its financial advisor in connection with the mergers, including the delivery of a fairness opinion as described above. Inuvo agreed to pay Canaccord a fee of $250,000 for its services, plus a fee equal to 2.0% of the aggregate transaction consideration which is contingent upon consummation of the mergers (and against which the $250,000 fee is credited). It is estimated that Canaccord will receive an aggregate fee of approximately $1.5 million in connection with the mergers. In addition, Inuvo has agreed to reimburse Canaccord for certain expenses and to indemnify Canaccord and related persons against various liabilities, including under the federal securities laws.

122.    The S-4 states that "In the prior two years, Canaccord has not received compensation for investment banking or financial advisory services from either Inuvo (except as otherwise described in this joint proxy statement) or ConversionPoint. Canaccord may provide investment banking services to Inuvo, ConversionPoint or their respective affiliates in the future for which Canaccord may receive compensation."

123.    The S-4 states, as noted above, that in June 2017, Kilambi and Tallack met to discuss a potential investment banking relationship between Canaccord and ConversionPoint. The S-4 should clarify whether anything was agreed to, or to what extent it was implied that there might be an investment banking relationship between Canaccord and ConversionPoint at some point in the future.

124.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE REGISTRATION STATEMENT

125.    On December 17, 2018,New Parent filed the Form S-4 registration statement (reviewed and approved by Inuvo's Board) with the SEC in connection with the Proposed Merger containing background information and the financial analyses prepared by Canaccord for Inuvo in support of its fairness opinions favoring the Proposed Merger. The S-4 solicits the Company's shareholders to vote in favor of the Proposed Merger.

126.    Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material false and misleading statements or material misrepresentations or omissions. However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

**Material Omissions Relating to Background Information**

127.    The S-4 discloses that the Company entered into non-disclosure agreements with, at least, Parties A, B and C. The S-4 fails to disclose whether these non-disclosure agreements (or any other non-disclosure agreements or similar agreements in effect) contain don't-ask-don't-waive ("DADW") standstill provisions that are currently precluding any of these 3 or more interested parties from making a topping bid for the Company.

128.    The press release announcing the Mergers also states that "Inuvo shareholders will receive $0.45 per share in cash and ***stock valued at an estimated $1.77 per share***, or approximately[ ]$75.5 million in total consideration" (emphasis added) but the basis for valuing the stock received at $1.77 per share is not disclosed.

**Material Omissions Relating to Canaccord's Analyses and Fairness Opinion**

129.    According to the S-4, Canaccord performed several material financial analyses in connection with rendering its fairness, opinion dated November 1, 2018. Those financial analyses included the following analyses:

        a.    Inuvo Selected Public Companies Analysis;

        b.    Inuvo Selected Precedent Transactions Analysis;

        c.    Inuvo Discounted Cash Flow Analysis;

        d.    ConversionPoint Selected Public Companies Analysis;

        e.    ConversionPoint Discounted Cash Flow Analysis, and;

        f.    Merger Consideration Analysis.

**The Foregoing Analyses Omits Material Information**

130.    Each of the foregoing analyses relies upon certain financial forecasts that were provided to Canaccord. The S-4 discloses that Canaccord, *inter alia*, analyzed certain internal financial statements and other business and financial information, including … projected financial and operating data concerning Inuvo provided to Canaccord by senior management of Inuvo and concerning ConversionPoint provided to Canaccord by senior management of ConversionPoint[.]" Such internal financial information, sometimes referred to as the "internal financial forecasts" or other forward-looking financial information, provided to Canaccord by Inuvo and ConversionPoint were neither confirmed by Canaccord nor provided to shareholders.

131.    The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company and allows them to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Without such information, Plaintiff and the Class cannot evaluate whether the price being offered for Inuvo reflects its true value.

132.    The S-4 entirely omits the Inuvo and ConversionPoint forecasts while repeatedly referencing the same.

133.    Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

134.    Not only must the Inuvo and ConversionPoint forecasts be disclosed, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures. The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[3] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[4] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

135.    The omission of these forecasts renders the financial projections included in the S-4 materially incomplete and misleading. If a proxy or registration statement soliciting a shareholder vote discloses financial projections and valuation information, such projections must be complete and accurate.

**Canaccord's Selected Public Companies Analyses Are Further Incomplete**

136.    With respect to Canaccord's Selected Public Companies Analyses, the S-4 fails to disclose: (i) the basis or parameters used, if any, for the determination that (a) the companies selected were similar for purposes of the analysis and (b) the financial information of the selected companies were similar for purposes of the analysis; (ii) the parameters for determining the

---

[3] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, *N.Y. Times*, Apr. 22, 2016, *available at* https://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html.

[4] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

market size and product profile for the selected companies; (iii) the basis for determining that the Enterprise Value / LTM EBITDAs greater than 50.0x are not meaningful, (iv) the reason half of the Inuvo selected public companies were selected even if they had Enterprise Value / LTM EBITDAs that were not meaningful and (v) the inputs and specific information used in calculating the specific Enterprise Value Multiple of EBITDA for each of the selected companies.

137.    The Selected Public Companies Analyses also fail to disclose the forecast information (referenced above) used to apply the analyses to the Proposed Merger.

**Canaccord's Discounted Cash Flow Analyses Are Further Incomplete**

138.    With respect to Canaccord's Discounted Cash Flow Analyses, the S-4 fails to disclose how Canaccord determined, and the reasons for using, the following numbers and ranges: (i) discount rates ranging from 19.0% to 21.00%; for Inuvo and 15.5% to 17.5% for ConversionPoint; (ii) the underlying discounted cash flows, including the inputs into the same; and (iii) a terminal EBITDA multiples reference range of 7.00x to 9.00x for Inuvo and ConversionPoint.

139.    With respect to the various analyses, the omitted information and key inputs are material to Inuvo shareholders, and their omission renders the summary of the financial advisors' fairness opinions materially incomplete and misleading.

**COUNT I**

**(AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 PROMULGATED THEREUNDER)**

140.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

141.    Section 14(a)(1) makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect

of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

142.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

143.    Defendants have issued the S-4 with the intention of soliciting stockholders support for the Proposed Merger. Each Defendant reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, among other things, the financial projections for the Company and the fairness opinion of Inuvo's financial advisor.

144.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each Defendant, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a). Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

145.    Defendants knew, or in the absence of negligence would have known, that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

146.    Defendants knew, or in the absence of negligence would have known, that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the S-4 and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

147.   Defendants were, at the very least, negligent in preparing and reviewing the S-4. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

148.   The misrepresentations and omissions in the S-4 are material to Plaintiff and the other members of the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

149.   Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the other members of the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT)

150.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

151.   The Individual Defendants acted as controlling persons of Inuvo within the meaning of Section 20(a) as alleged herein. By virtue of their positions as officers and/or directors of Inuvo, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

152.   Each of the Individual Defendants was provided with, or had unlimited access to, copies of the S-4 and other statements alleged by Plaintiff to be materially misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

153.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

154.    In addition, as set forth in the S-4 at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

155.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a).

156.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a). As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

157.    Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the other members of the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.      Directing Defendants to account to Plaintiff and the other members of the Class for all damages sustained as a result of their wrongdoing if the Mergers are consummated before the Company discloses the material information discussed above which has been omitted from the S-4;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all issues to triable.

DATED: December 20, 2018                              Respectfully Submitted,

**OF COUNSEL**                                              **WETHERALL GROUP, LTD.**

**STULL, STULL, & BRODY**                        /s/ Peter C. Wetherall
                                                                   Peter C. Wetherall, Esq.
Aaron Brody                                               Nevada Bar No. 4414
Michael J. Klein                                         9345 W. Sunset Road, Suite 100
6 East 45th Street                                      Las Vegas, NV 89148
New York, NY 10017                                 Telephone:  (702) 838-8500
Telephone:  (212) 687-7230                     Email    pwetherall@wetherallgroup.com
Email:        abrody@ssbny.com
                  mklein@ssbny.com               *Attorneys for Plaintiff*

*Attorneys for Plaintiff*

36